# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    NORFOLK SUPERIOR COURT
                                               CIVIL ACTION NO. _____

|  |  |
|---|---|
| RICHARD J. HUERTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANTHEM INSURANCE COMPANIES INC., | ) |
| ANTHEM UM SERVICES, INC., | ) |
| VERIZON MEDICAL EXPENSE PLAN FOR | ) |
| NEW YORK AND NEW ENGLAND | ) |
| ASSOCIATES, | ) |
| MILTON HEALTHCARE LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

## VERIFIED COMPLAINT

### I.    PRELIMINARY STATEMENT

1.  Plaintiff Richard Huerth hereby alleges the following in support of his claims against

    Defendants Milton Health Care LLC, Anthem BlueCross Blue Shield (the trade name

    of Anthem Insurance Companies Inc.), Anthem UM Services, Inc., and Verizon

    Medical Expense Plan for New York and New England Associates.

### II.    JURISDICTION AND VENUE

2.  This Court has exclusive subject matter jurisdiction over Plaintiff's claims because

    the amount of damages alleged in these claims exceeds $25,000. See MGL c. 212,

    sec. 3.

3.  This Court has concurrent subject matter jurisdiction with the U.S. District Court over

    Plaintiff's claims against Anthem Insurance Companies Inc., Anthem UM Services,

Inc., and Verizon Medical Expense Plan for New York and New England Associates

that arise under ERISA, 29 U.S.C. § 1001 et seq. A civil action may be brought in

U.S. District Court or in "[s]tate courts of competent jurisdiction"—29 U.S.C. §

1132(e)(1)—"to recover benefits due [to a participant] under the terms of his plan, to

enforce his rights under the terms of the plan, or to clarify his rights to future benefits

under the terms of the plan." <u>Id.</u> § 1132(a)(1)(B).

4.   Venue before this Court is proper under MGL c. 223, § 1, as this is a transitory action

"brought in the county where one of [the parties] lives."

## III.   THE PARTIES

5.   The plaintiff, Richard J. Huerth (Mr. Huerth) is a 64-year-old man who is confined to

a bed, paralyzed from the waist down, and resides at the Plaintiff's nursing home. <u>See</u>

<u>Affidavit of Julie Peterson in Opposition to Plaintiff's Motion for Summary</u>

<u>Judgment</u>, ¶¶ 2, 3.

6.   The defendant, Milton Health Care LLC (MHC), is a Massachusetts limited liability

company with a principal place of business located at 1200 Brush Hill Road, Milton,

Norfolk County, Massachusetts. <u>See</u> <u>Plaintiff's Statement of Material Facts</u>, ¶ 1.

7.   The defendant, Anthem Insurance Companies Inc.—a subsidiary of Anthem, Inc.—is

an Indiana corporation with a principal place of business located at 120 Monument

Circle, Indianapolis, Indiana.

8.   The defendant, Anthem UM Services Inc.—a subsidiary of Anthem Inc.—is an

Indiana corporation with a principal place of business located at 120 Monument

Circle, Indianapolis, Indiana.

9. The defendant, Verizon Medical Expense Plan for New York and New England Associates, is an ERISA employee welfare benefit plan with (a) a plan sponsor of Verizon Communications Inc., a Delaware corporation with a principal place of business located at 7900 Xexes Ave. So. in Minneapolis, Minnesota and (b) a plan administrator of Chairperson of the VEBC (Verizon Employee Benefits Center), c/o Verizon Benefits Center with a principal place of business in Norfolk, Virginia.[1]

## IV.   STATEMENT OF RELEVANT FACTS

10. Mr. Huerth worked for New England Telephone from approximately 1972 to 1997. In 1974, Mr. Huerth suffered an injury during a rollover vehicle accident that left him paralyzed from the waist down. Despite his disability, Mr. Huerth continued to work for New England Telephone (now Verizon) as an inside technician. See Affidavit of Defendant Richard Huerth in Opposition to Plaintiff's Motion for Summary Judgment, ¶ 3.

11. Mr. Huerth accepted early retirement from Verizon in 1997 in exchange for a full benefits package that included lifetime health insurance under an ERISA-covered and Verizon-sponsored group health care plan—the Verizon Medical Expense Plan for New York and New England Associates (the "Verizon Plan"). See Exhibit 6[2]: Medical Benefits Summary Plan Description for New York and New England Associates; Affidavit of Defendant Richard Huerth, ¶ 4.

12. After accepting early retirement from Verizon in 1997, Mr. Huerth continued to live independently in a rented apartment in Weymouth. After suffering from a decubitus ulcer (otherwise known as a pressure ulcer or colloquially as a bed sore) in 2005, Mr.

---

[1] The Verizon Benefits Center appears to be owned and administered by Verizon Communications, Inc.
[2] All exhibits cited herein refer to Exhibits included the Joint Appendix, filed as part of Plaintiff's Rule 9A Motion for Summary Judgment Package.

Huerth transitioned to a skilled nursing facility (Emerald Court Health & Rehabilitation Center in Norwood, Massachusetts ("Emerald")). Mr. Huerth moved from Emerald to MHC on October 22, 2007. See Affidavit of Defendant Richard Huerth, ¶ 5.

13. MHC was contractually authorized to and obligated to properly apply for the health insurance benefits available to Mr. Huerth to cover the care for which MHC is now suing Mr. Huerth for payment.  See Exhibit 55 at 17-27: MHC's "Admission and Financial Agreement" dated October 26, 2007; Exhibit 1: MHC's "Admission and Financial Agreement" dated July 2, 2008. The Admission and Financial Agreements, drafted by MHC, specifically provide that MHC is assigned "any and all third party payments to which the Resident [Mr. Huerth] may be or become entitled to for services rendered by [MHC]."  They further provide that "[a]ny insurance benefit payments . . . shall be paid to [MHC]."  In addition, MHC stated in these documents (which MHC prepared) that MHC is authorized by Mr. Huerth "to apply and file for all such benefit payments on [his] behalf." Id.

14. Mr. Huerth's medical expenses from his first day at MHC (October 22, 2007) until December 31, 2013 were paid in full by Empire Blue Cross Blue Shield ("Empire"), an insurance company that was selected by the Verizon Plan to provide health benefits to participants of the Verizon Plan. See Exhibit 7: Empire BlueCross BlueShield Explanation of Benefits dated July 5, 2013 (listing a payment for "sub-acute care" to MHC for July 2012 in the amount of $11,814.43); Affidavit of Julie Peterson, ¶ 2. In 2009, however, Empire initially denied coverage for approximately

five (5) months because MHC failed to make a "precertification call" to Empire when Mr. Huerth returned to MHC from a hospital visit. Affidavit of Julie Peterson, ¶ 13.

15. On January 1, 2013, the Verizon Plan switched health insurance companies from Empire to Anthem Blue Cross Blue Shield, which is the trade name of Anthem Insurance Companies, Inc., an independent licensee of the Blue Cross and Blue Shield Association. Affidavit of Julie Peterson, ¶ 4. The amounts that are alleged to be due to MHC were incurred from January 1, 2013 to the present, during which time Anthem Insurance Companies, Inc. provided health insurance benefits to participants of the Verizon Plan. See Exhibit 8: List of Richard Huerth's Denied Claims from Anthem Insurance Companies, Inc. from August 1, 2013 to May 31, 2015; Exhibit 9: Anthem Insurance Companies, Inc.'s Explanations of Benefits from June 28, 2013 to June 19, 2015 (listing claims paid, pending, and denied from January 1, 2013 to May 22, 2015); Exhibit 10: List of Richard Huerth's Claims (paid, pending, and denied) from Anthem Insurance Companies, Inc. from August 1, 2013 to May 31, 2015.

16. Anthem UM Services, Inc., a separate company from Anthem Insurance Companies Inc., provides utilization management (UM) review services for Anthem Insurance Companies, Inc. Utilization Management is a "series of integrated processes that help to ensure that treatment is medically necessary as required by the member's contract." Exhibit 11: Anthem BlueCross BlueShield, UM Review Requirements, available at https://www.anthem.com/wps/portal/ahpprovider?content_path=provider/va/f4/s0/t0/pw_b147998.htm&state=va&label=Utilization%20Management%20Review%20Requirements (last visited August 14, 2015).

17. On or about July 1, 2013, Mr. Huerth received a copy of a letter originally addressed to MHC from Anthem UM Services, Inc. This letter states "[w]e cannot approve your request for continued stay in a Skilled Nursing Facility" because the care that Mr. Huerth received from February 1, 2013 to March 31, 2013 is "not skilled care," "custodial in nature," and "not medically necessary." The letter further states that Mr. Huerth is "not making progress with [his] physical therapy, and that other care he receives "can be done by people who do not have medical training." Exhibit 12-A: Initial Coverage Denial Letter from Anthem UM Services, Inc. (July 1, 2013).

18. Anthem Insurance Companies, Inc. based its denial of coverage for Mr. Huerth's nursing care at MHC—both in its initial denial letter on July 1, 2013 (see Exhibit 12-A) and all other coverage denial letters (see Exhibit 12-B to 12-M)—solely on Anthem CG (Clinical Guideline) MED-31: Skilled Nursing Facility Services. This clinical guideline explains the criteria that skilled nursing facility services must meet in order to be considered "medically necessary"—and therefore a service eligible for coverage under Mr. Huerth's health care plan. See Exhibit 17: Anthem CG-MED-31: Skilled Nursing Facility Services. Anthem CG-MED-19 explains Anthem's definition of "custodial care," which does not meet the criteria for skilled nursing facility or skilled rehabilitation services—and therefore ineligible for coverage under Mr. Huerth's health care plan. See Exhibit 18: Anthem CG-MED-19: Custodial Care.

19. Shortly after receiving the Initial Coverage Denial Letter from Anthem UM Services, Inc. on July 1, 2013, Mr. Huerth's physician at MHC Dr. Brian Kenny (acting as an agent of MHC) visited Mr. Huerth and told him as follows:

> I don't want you to worry, but you will be receiving a letter from the insurance company saying that they will not cover your stay in

> the nursing home. I will take care of it. All I have to do is call and
> have a discussion with their [Anthem's] doctor. It's called a peer to
> peer call, and we'll straighten it all out. Don't worry—you don't
> have to do a thing I will take care of it.

Affidavit of Defendant Richard Huerth, ¶ 9.

20. Mr. Huerth's course of medical treatment at MHC meets the criteria for "medically

    necessary" skilled nursing care set forth in Anthem CG-MED-31. In order to qualify

    as "medically necessary" skilled nursing facility services, all of the criteria in Section

    A and at least one of the criteria in Section B of this guideline must be met. See

    Exhibit 17: Anthem CG-MED-31: Skilled Nursing Facility Services.

21. Section A of Anthem CG-MED-31 states that:

1. The individual requires skilled nursing or skilled rehabilitation services
   that must be performed by, or under the supervision of, professional or
   technical personnel; **and**
2. The individual requires these skilled services on a *daily* basis; (note: if
   skilled rehabilitation services are not available on a 7-day-a-week basis, an
   individual whose inpatient stay is based solely on the need for skilled
   rehabilitation services would meet the "daily basis" requirement when
   he/she needs and receives those services at least 5 days a week); **and**
3. As a practical matter, the daily skilled services can be provided only on an
   inpatient basis in a skilled nursing facility (SNF) setting; **and**
4. SNF services must be furnished pursuant to a physician's orders and be
   reasonable and necessary for the treatment of an individual's illness or
   injury (i.e., be consistent with the nature and severity of the individual's
   illness or injury, his particular medical needs and accepted standards of
   medical practice; **and**
5. Initial admission and subsequent stay in a SNF for skilled nursing services
   or rehabilitation services must include development, management and
   evaluation of a plan of care as follows:
   a. The involvement of skilled nursing personnel is required to meet
      the individual's medical needs, promote recovery and ensure
      medical safety (in terms of the individual's physical or mental
      condition); **and**
   b. There must be a significant probability that complications would
      arise without skilled supervision of the treatment plan by a licensed
      nurse; **and**

c. Care plans must include realistic nursing goals and objectives for the individual, discharge plans and the planned interventions by the nursing staff to meet those goals and objectives; **and**

d. Updated care plans must document the outcome of the planned interventions; **and**

e. There must be daily documentation of the individual's progress or complications.

22. MHC reported to Third Party Defendant Anthem UM Services that "Mr. Huerth does not transfer; he is a physical assist with bathing, and limited assist with grooming." Further, according to MHC, Mr. Huerth's "self care deficits are due to the fact that he is a paraplegic," and Mr. Huerth "requires Skilled Nursing care for wound care, pain management, colostomy care, supra pubic, and contractures." Exhibit 13: Level 1 Appeal to Anthem UM Services, Inc. (Aug. 20, 2013).

23. MHC further reported to Third Party Defendant Anthem UM Services that:

> Per the Anthem skilled nursing facility guidelines, one of the guidelines for coverage is that the resident must require **DAILY** skilled care. Mr., [sic] Huerth's nursing notes clearly indicate daily dressing changes to the unstageable wound in February, 2013 and May, 2013. Daily skilled nursing care by a professional nurse was most certainly warranted to make observations of the wound for signs and symptoms of drainage and infection. The skilled observation could not have been performed by a lay person in another setting.

Exhibit 14: "Second Level Appeal" Letter from Susan Musgrove, RN and MHC's Corporate Director of Chart Audits and Appeals for MHC (Nov. 14, 2013). Mr. Huerth's pressure ulcers progressed from an "unstageable" wound in February 2013 (which is more serious than the Stage II, III, or IV pressure ulcers required by CG-MED-31) to a Stage IV wound in April 2013 "clearly indicating that there was a healing process occurring with daily skilled nursing wound care." Id.

24. Further, one of Mr. Huerth's medical providers at MHC—Nurse Practitioner Toyin Oladosu, a nurse practitioner who has treated Mr. Huerth and examined him on

March 11, 2015—submitted a sworn statement to the Norfolk County Probate Court

based on her examination of Mr. Huerth, a review of his records, and discussions with

his providers that Mr. Huerth was admitted to MHC in 2007 with "diagnosis of spinal

cord injury, paraplegia, stage IV on buttocks, anemia, depression" and that these

conditions have "not improved significantly since admission in 2007." Exhibit 22:

Medical Certificate Guardianship or Conservatorship.

25. This same medical provider from MHC further reported to the Probate Court (in the

Medical Certificate filed with the Petition for Conservatorship) that Mr. Huerth has

impairment of his memory and cognitive functioning, as well as of his emotional and

psychiatric functioning. Id.

26. This same medical provider from MHC further reported to the Probate Court (in the

Medical Certificate filed with the Petition for Conservatorship) that Mr. Huerth needs

a long term "institutional placement" at a "nursing home/rehabilitation," and that he

requires "24 hour supervision." Id.

27. This same medical provider from MHC further reported to the Probate Court (in the

Medical Certificate filed with the Petition for Conservatorship) that Mr. Huerth

requires "long term care" due "to his quadaplegia," and that "he has [required] wound

care for the last seven years." Id.

28. In addition, Mr. Huerth's medical records at MHC include detailed instructions for

his treatment and care as ordered by his treating physician, Brian Kenny.  Exhibit 22:

Physician's Orders, MHC Medical Records (March 11, 2015).  Dr. Kenny's orders

for Mr. Huerth's care include: (a) "resident requires nursing home facility services;"

(b) that Mr. Huerth must be assessed "for pain every shift;" (c) that nurses must

"check for bleeding and bruising every shift;" (d) that wound care is needed daily; and (e) nurses must "measure and stage all wounds and document in wound book every week." Id.

29. Mr. Huerth's current medical condition, separate from the medical records noted above, satisfies all of the conditions of Section A of Anthem CG-MED-31.

30. Mr. Huerth's medical records establish, separate from and in addition to those medical records noted above, that all of the conditions of Section A of Anthem CG-MED-31 are satisfied.

31. The facts set forth in ¶¶ 22 to 30 above demonstrate that all conditions and terms of Section A of Anthem CG-MED-31 are satisfied.

32. Section B of Anthem CG-MED-31 requires, in addition to all of the conditions of Section A being satisfied—which they are in Mr. Huerth's case—that one of the following additional terms be satisfied for care to qualify as medically necessary:

    b. *Section B:*

        3. **Complex medication regimen**
           a. The individual must have a complex range of new medications (including oral medications) following a hospitalization where there is a high probability of adverse reactions or a need for changes in the dosage or type of medication.
           b. Documentation required to authorize initial admission and extensions must include the individual's unstable condition, medication changes and continuing probability of complications. **OR**

          ...

        6. **Wound care (including decubitus/pressure ulcers)**
        **Note:** Skilled nursing facility placement solely for the purpose of wound care should be rare.
        **All** of the following criteria must be met:

    a. Wound care must be ordered by a physician; **and**
    b. The individual must require **extensive** wound care (e.g., packing, debridement or irrigation of multiple stage II, or one or more stage III or IV wounds); **and**
    c. Skilled observation and assessment of a wound must be documented daily and should reflect any changes in wound status to support the medical necessity for continued observation.

<u>Exhibit 17</u>: Anthem CG-MED-31: Skilled Nursing Facility Services.

33. Mr. Huerth's medical records establish that his treating physician, Dr. Brian Kenny, has prescribed extensive medications to treat Mr. Huerth's extensive medical and psychiatric conditions, subsequent to "hospital stay" and admission to MHC.  <u>Exhibit 22</u>: Physician's Orders, MHC Medical Records (March 11, 2015).  Dr. Kenny's written orders related to Mr. Huerth's medication include extensive instructions with regard to the use of various medications, as well as the instruction that the nursing staff "check daily total from all medications." <u>Id.</u>

34. Further, Mr. Huerth needs extensive wound care, as ordered by his physician and which is required, by order of his physician, to be documented regularly in his records. <u>Id.</u> Dr. Kenny's orders, recorded in his medical records at MHC (<u>see</u> <u>Exhibit 56</u>) and the sworn statement submitted to the Norfolk County Probate Court by one of his treating providers (a nurse practitioner), document Mr. Huerth's need for extensive wound care. <u>Id.</u>

35. Mr. Huerth's current medical condition, separate from the medical records noted above, satisfies conditions 3 and 6 of <u>Section B</u> of Anthem CG-MED-31.

36. Mr. Huerth's medical records establish, separate from and in addition to those medical records noted above, that conditions 3 and 6 of <u>Section B</u> of Anthem CG-MED-31 are satisfied.

37. The facts set forth in ¶¶ 28 and 33-36 above demonstrate that conditions 3 and 6 of Section B of Anthem CG-MED-31 are satisfied in Mr. Huerth's case.

38. On August 15, 2013, MHC Business Office Manager Eric M. Bickelhaupt submitted a "first level appeal" to Anthem UM Services, Inc. on behalf of Mr. Huerth. This appeal letter disputes that the care provided to Mr. Huerth is "custodial" in nature because "Mr. Huerth does not transfer; he is a physical assist with bathing, and limited assist with grooming." The appeal letter further states that these "self care deficits are due to the fact that he is a paraplegic," and that Mr. Huerth "requires Skilled Nursing care for wound care, pain management, colostomy care, supra pubic, and contractures." Exhibit 13: Level 1 Appeal to Anthem UM Services, Inc. (Aug. 20, 2013). This "first level appeal" letter does not explain (1) that Mr. Huerth's course of treatment at MHC meets the criteria for "skilled nursing facility services" under Anthem CG-MED-31, (2) the specific details of Mr. Huerth's medical treatment that qualify for "skilled nursing facility services" under Anthem CG-MED-31, or (3) that Mr. Huerth's course of treatment is not merely "custodial care" under Anthem CG-MED-19. Id. In an email to Mr. Huerth's niece Julie Peterson on August 16, 2013, Mr. Bickelhaupt states as follows:

> If you like to read…Google CG-MED-31. This is the clinical guideline that Anthem states they are using to make the decisions. I pulled this yesterday and will try to incorporate some of the verbage they use in the next appeal.

Exhibit 20: Email from Eric Bickelhaupt to Julie Peterson (Aug. 16, 2013) (emphasis added). To the best of Defendant's knowledge and belief, Mr. Bickelhaupt never prepared another appeal letter on Mr. Huerth's behalf after his "first level appeal" letter on August 15, 2013.

39. On September 19, 2013, Anthem UM Services Inc. sent a letter to Mr. Huerth

rejecting the "first level appeal" on the basis that, inter alia, Mr. Huerth's care does

not meet the Anthem clinical guidelines for "Skilled Nursing Care and Custodial

Care" set forth in CG-MED-31:

> Per the health plan clinical guidelines: CG-MED031 (Skilled Nursing
> Care and Custodial Care), to qualify for treatment in this type of health
> care facility the member must require each day multiple assessments
> of vital signs and body systems and other skilled needs (medical care,
> therapies, etc. from a licensed professional). General care and
> supervision is not considered a skilled need. These can usually be
> taught to a family member or lay person and performed in the home.
> The skilled nursing facility level is not approved for the period
> 02/01/2013 – 03/31/2013 and 05/01/2013 – 05/31/2013. The care
> being provided is custodial in nature and not medically necessary.

See Exhibit 12-G: First Level Appeal Denial from Anthem UM Services, Inc. (Sept.

19, 2013).

40. On November 14, 2013, Susan Musgrove, RN—MHC's Corporate Director of Chart

Audits and Appeals—sent a "second level appeal" letter to Anthem UM Services Inc.

for the denial of skilled nursing coverage for February and May 2013. This first two

paragraphs of this letter are reproduced below in their entirety:

> Milton Health Care, where Mr. Huerth resides, does not agree with
> your recent decision not to cover his care and we are requesting a second
> level of appeal.
> Per the Anthem skilled nursing facility guidelines, one of the
> guidelines for coverage is that the resident must require **DAILY** skilled
> care. Mr., [sic] Huerth's nursing notes clearly indicate daily dressing
> changes to the unstageable wound in February, 2013 and May, 2013.
> Daily skilled nursing care by a professional nurse was most certainly
> warranted to make observations of the wound for signs and symptoms of
> drainage and infection. The skilled observation could not have been
> performed by a lay person in another setting.

Exhibit 14: "Second Level Appeal" Letter from Susan Musgrove, RN and MHC's

Corporate Director of Chart Audits and Appeals for MHC (Nov. 14, 2013). After

13

these first two paragraphs, Ms. Musgrove proceeds to describe the details of one of

Mr. Huerth's pressure ulcers, which progressed from an "unstageable" wound in

February 2013 (which is more serious than the Stage II, III, or IV pressure ulcers

required by CG-MED-31) to a Stage IV wound in April 2013 "clearly indicating that

there was a healing process occurring with daily skilled nursing wound care." Id. Like

Mr. Bickelhaupt's "first level appeal" letter, Ms. Musgrove's "second level appeal"

letter fails to list the specific criteria set forth in CG-MED-31 for "medically

necessary" skilled nursing care and how Mr. Huerth's course of treatment meets those

criteria. See id.; Exhibit 13: Level 1 Appeal to Anthem UM Services, Inc. (Aug. 20,

2013); Exhibit 17: Anthem CG-MED-31: Skilled Nursing Facility Services (Effective

Date Oct. 14, 2014).

41. Anthem UM Services Inc. sent two "second level appeal" denial letters to Mr. Huerth

on January 16, 2014. The first denial letter relates to the second level appeal for

Anthem UM Services' Inc.'s denial of coverage from February 1, 2013 to March 31,

2013; the second letter relates to the denial of coverage from May 1, 2013 to May 31,

2013. With the exception of the dates of the claims for medical treatment, both of

these letters are identical: they state that the "previous coverage decision can't be

changed," and reiterate Anthem UM Services Inc.'s position that the care Mr. Huerth

receives at MHC is "not medically necessary." Anthem UM Services states that this

determination is based on the following review by "Anthem's Physician Consultant

who specializes in Internal Medicine":

> The request for coverage of skilled nursing facility level of care is not
> approved as medically necessary. The notes sent in were reviewed.
> The member is noted to be in long term care since 2007. The member
> is not able to provide care for himself and is paralyzed. The member

requires help with all aspects of daily living, including turning and positioning and medications. Also, the member requires help with bladder and bowel (catheter and ostomy). These are all long term needs. Per the health plan clinical guidelines: Skilled Nursing Care and Custodial Care, to qualify for treatment in this type of health care facility the member must require each day multiple assessments of vital signs and body systems and other skilled needs (medical care, therapies, etc. from a licensed professional). General care and supervision is not considered a skilled need. These can usually be taught to a family member or lay person and performed in the home. The care being provided is custodial in nature.

See Exhibit 12-K & 12-L: Second Level Appeal Denial Letters from Anthem UM Services Inc. (Jan. 16, 2014).

42. Between August 7, 2013 and July 10, 2015, a total of 155 claims for medical insurance coverage were filed with Anthem Insurance Companies, Inc. on Mr. Huerth's behalf. Anthem Insurance Companies, Inc. approved 112 of these claims and denied forty-three 43 of these claims. All of the 43 claims that Anthem Insurance Companies Inc. denied were for services billed by MHC. The total "member responsibility" for the denied claims is $446,175.94. Exhibit 10: Anthem Insurance Companies, Inc., List of All Claims from August 7, 2013 to July 10, 2015 (paid, pending, and denied).

43. The claim details for each of the denied claims reveal that only 6 of the 43 denied claims indicated that Anthem Insurance Companies Inc. rendered a final determination regarding Mr. Huerth's coverage for the billed service. For example, these 6 "final determination" claims indicate that the services rendered are "not medically necessary," are "not a covered benefit," or that the "required predetermination [for the service] has been denied." The remaining 37 denied claims suggest that final determinations regarding coverage for the billed services on these

<u>dates have not been made due to administrative failures of MHC to submit proper</u>
<u>documentation in a timely manner to the appropriate decision-maker.</u> For example,
the majority of the 37 denied claims for which a final determination regarding
coverage has not been made indicate that, "due to the denial by Medicare, your
provider has been asked to file this service to the local Blue Cross and Blue Shield
Plan where the services were rendered." Other "non-final determination" denied
claims state that the "claim [was] submitted to BCBS in error" because "Medicare has
primary responsibility" or that a final determination has not been made because
"medical records have been requested" but have not yet been received. See <u>Exhibit 8</u>:
List of Richard Huerth's Denied Claims from Anthem Insurance Companies, Inc.
from August 1, 2013 to May 31, 2015; <u>Exhibit 9</u>: Anthem Insurance Companies,
Inc.'s Explanations of Benefits from June 28, 2013 to June 19, 2015 (listing claims
paid, pending, and denied from January 1, 2013 to May 22, 2015).

44. The Admission and Financial Agreements executed by Plaintiff Mr. Huerth and
drafted by Defendant MHC specifically provide that MHC is assigned "any and all
third party payments to which the Resident [Mr. Huerth] may be or become entitled
to for services rendered by [MHC]." It further provides that "Any insurance benefit
payments . . . shall be paid to [MHC]." In addition, MHC stated in the document,
prepared by it, that MHC is authorized by Mr. Huerth "to apply and file for all such
benefit payments on [his] behalf."

45. Anthem Insurance Companies, Inc.—working in conjunction with Anthem UM
Services, Inc.—and/or the Verizon Plan denied coverage for Mr. Huerth's skilled
nursing care.

46. On November 4, 2014, MHC filed suit against Mr. Huerth in this Court, demanding payment of over $200,000 for his care, plus daily accruals from the date of the complaint. The damages alleged by MHC are a direct result of the denial of coverage by Anthem Insurance Companies Inc., Anthem UM Services, Inc., and/or the Verizon Plan, which have refused to cover Mr. Huerth's skilled nursing care at MHC. See Plaintiff's Complaint.

47. On March 3, 2015, MHC filed a Verified Motion for Appointment of Temporary Conservator Pursuant to G.L. c. 190B, § 5-412A with the Norfolk Probate and Family Court. On March 11, 2015, MHC filed a Medical Certificate—Guardianship or Conservatorship, signed by Nurse Practitioner Toyin Oladosu, which states that Mr. Huerth "requires full conservatorship" because "[h]e is unable to manage finances independently and requires assistance for all financial decisions." The Norfolk Probate and Family Court dismissed this motion without prejudice on March 23, 2015. Exhibit 22: Conservatorship Documents, Norfolk Probate and Family Court (docket no. 15P0516).

48. On July 1, 2015, MHC served Mr. Huerth a document entitled "30-Day Notice of Intent to Transfer/Discharge Resident," which proposed to transfer Richard Huerth to a nursing home in Ovid, Michigan due to non-payment of amounts allegedly due to Milton Health Care. This document required that Mr. Huerth or his legal representative request a "Fair Hearing" within 30 days of the date of the Notice. Attorney Morris, on behalf of Mr. Huerth, filed a request for a Fair Hearing and a letter explaining some of the bases for the objection on July 28, 2015 and on July 29, 2015, emailed a copy of the same to Attorney Thomas Carpenter ("Attorney

Carpenter"). <u>Exhibit 32</u>: Letter to Nick Baker, MHC (July 29, 2015) with Request for Fair Hearing (July 28, 2015).

49. MHC's only basis for seeking to involuntarily discharge and transfer Mr. Huerth against his will to Michigan is that his care has not been paid for since January 1, 2013; this is the date on which Anthem and Anthem UM began denying payment of Mr. Huerth's treatment, after its predecessor, Empire, had paid for his treatment without exception for the preceding four years. <u>Exhibit 32</u>: Letter to Nick Baker, MHC (July 29, 2015) with Request for Fair Hearing (July 28, 2015); <u>see also</u> <u>Exhibit 58</u>: Copy of Appellant Richard Huerth's Response Brief (Sept. 4, 2015); <u>SRF ¶¶ 14-15,17-18</u>, <u>supra</u>.

50. On August 14, 2015, Plaintiff Richard Huerth defended himself at a "Fair Hearing" in response to Defendant MHC's Notice of Intent to Transfer/Discharge Resident (to a nursing home in Ovid, Michigan) before the Massachusetts Office of Medicaid, Board of Hearings. <u>See</u> <u>Exhibit 55</u>: Copy of Appellant Richard Huerth's Response Brief, ¶ 26.

51. Attorney Matthew Morris filed the Response Brief of Appellant Richard Huerth on September 4, 2015. Appellee MHC's Response Brief is due on September 11, 2015. Hearing Officer Cynthia Kopka is scheduled to render a decision on this case on or about September 12, 2015. <u>See Exhibit 56</u>: "Record Open" Notice from the Board of Hearings (Aug. 14, 2015).

52. Mr. Huerth is challenging MHC's attempted involuntary discharge and transfer to a Michigan facility in an administrative proceeding within the Massachusetts state government, before the Office of Medicaid, Board of Hearings. <u>See</u> <u>Exhibit 58</u>: Copy

of Appellant Richard Huerth's Response Brief. Mr. Huerth's objection includes, <u>inter</u>

<u>alia</u>, that payment for his treatment and stay at MHC since January 1, 2013 is owed

by Anthem Insurance Companies and/or Verizon Plan, and not by Mr. Huerth.

<u>Exhibit 32</u>: Letter to Nick Baker, MHC (July 29, 2015) with Request for Fair Hearing

(July 28, 2015).  Mr. Huerth's letter to the Board of Hearings appealing the Notice of

Intent to Transfer states as follows:

> The fundamental basis for MHC's claim—that Mr. Huerth "has failed,
> after reasonable and appropriate notice, to pay for (or failed to have
> Medicare or Medicaid pay for) [his] stay at the nursing facility"—is a
> matter that is currently being litigated before the Norfolk Superior Court.
> One of the defenses that Mr. Huerth has raised in his initial answer to
> MHC's complaint is that "the debt alleged is the debt of another (i.e. Blue
> Cross/Blue Shield)." Therefore, it would be premature to hold any hearing
> on this matter prior to the date on which the Norfolk Superior Court
> renders a final judgment on the merits of MHC's complaint to determine
> whether the responsibility for the alleged accrued balances are owed by
> (1) Mr. Huerth personally, (2) Mr. Huerth's health insurance provider,
> Blue Cross Blue Shield, (3) Medicaid/Medicare, or (4) an insurance
> company other than Blue Cross Blue Shield.

<u>Id.</u> at 1-2.

53. On September 4, 2015, Mr. Huerth filed his Response Brief in opposition to MHC's

Notice of Intent to Transfer/Discharge Resident. <u>See</u> <u>Exhibit 58</u>: Copy of Appellant

Richard Huerth's Response Brief. In his Response Brief, Mr. Huerth further

challenges the proposed transfer to the Michigan nursing home on the basis that (1)

the Notice of Intent to Transfer/Discharge Resident was not issued in accordance with

Federal and Massachusetts statutes and regulations (including the Attorney General's

Long-Term Care Facilities Regulations, 940 CMR 4.00 et seq.), (2) the Ovid,

Michigan facility is not a safe or appropriate place for Mr. Huerth in consideration of

its substandard/ "much below average" performance according to several objective

criteria (including ratings set forth on Medicare.gov's Nursing Home Compare

website), and (3) transferring Mr. Huerth to Michigan in the midst of the Norfolk

Superior Court proceedings constitutes a violation of Mr. Huerth's due process rights

of an opportunity to defend himself and provide live testimony (in consideration of

the extreme physical hardship associated with transferring Mr. Huerth from one

nursing home to another). See id.

V.    **PLAINTIFF RICHARD HUERTH'S CLAIMS AGAINST DEFENDANT
      MILTON HEALTH CARE LLC**

### COUNT I: VIOLATION OF M.G.L. C. 93A

54. Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1 through

53, inclusive, as set forth herein.

55. Defendant MHC violated the Notice of Intent to Transfer/Discharge Resident

requirements set forth in Attorney General regulations 940 CMR 4.09. These

regulations state that "[i]t shall be an unfair or deceptive act or practice, in violation

of MGL c. 93A, § 2, for a licensee or administrator" to "to discharge or transfer a

resident, when a state or federal agency refuses, or ceases to authorize payment for a

Medicare or Medicaid resident until all administrative appeals have been exhausted,"

"fail to discuss the planned discharge from the facility with the resident and his/her

legal representative or next of kin" and to "fail to consult the resident and his/her

family or legal representative in choosing another facility" as required by 940 CMR

4.09(2), (6) and (7).

56. Defendant MHC violated the "Residents' Personal Funds and Belongings"

requirements set forth in Attorney General Regulations 940 CMR 4.07. These

regulations state that "[i]t shall be an unfair or deceptive act or practice, in violation

of MGL c. 93A, § 2, for a licensee or an administrator (1) to require any resident to deposit his/her personal funds with the facility, (2) to fail or refuse to permit a resident to manage his/her personal financial affairs . . . [and] to manage a resident's personal funds without either his/her written authorization to do so or the written authorization of his/her legal representative . . . ."

57. Plaintiff alleges damages for Defendant MHC's violation of Chapter 93A of at least $28,003.06, which is approximately equivalent to the legal fees that Mr. Huerth has had to pay in order to defend against the Notice of Intent to Transfer/Discharge ($12,981.06) in addition to the amount of Mr. Huerth's SSDI checks that MHC deposited into MHC's own account without Mr. Huerth's prior knowledge or authorization ($15,022).

## COUNT II: CONVERSION

58. Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1 through 57, inclusive, as set forth herein.

59. Defendant MHC is liable to Plaintiff Richard Huerth for the tort of conversion because MHC intentionally or wrongfully exercised dominion and control over several of Richard Huerth's Social Security Disability Insurance (SSDI) checks— which were Mr. Heurth's personal property to which MHC had no right of possession—without Mr. Huerth's prior knowledge and authorization.

60. Plaintiff alleges damages for Defendant MHC's conversion of Mr. Heurth's SSDI checks in the amount of $15,022, which is the dollar amount of the SSDI checks that MHC wrongfully converted for its own benefit.

### COUNT III: NEGLIGENCE

61. Plaintiff repeats each and every allegation in paragraphs 1 through 60, inclusive, as set forth herein.

62. The denials of coverage from Anthem Insurance Companies Inc. and Anthem UM Services Inc. for skilled nursing facility services at MHC (which resulted in over $200,700 in damages according to the Plaintiff's Complaint and $270,765 in damages according to Plaintiff's Motion for Summary Judgment) were attributable, in part, to MHC's negligence in (1) failing to bill Anthem properly, (2) failing to adequately substantiate Mr. Huerth's need for skilled nursing facility services (i.e., the extent of his wound care treatment), and/or (3) failing to adequately prepare and/or substantiate the first and/or second level appeals from Anthem's coverage denials.

63. Defendant MHC is liable to Plaintiff Richard Huerth for the tort of negligence because (1) MHC owed a duty to Mr. Huerth to exercise a degree of "care, vigilance, and forethought which, in the discharge of the duty then resting on him, the person of ordinary caution and prudence ought to exercise under the particular circumstances," Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 221-222 (2009) (citations and internal quotations omitted), (2) MHC breached that duty by (a) failing to bill Anthem Insurance Companies Inc. and Anthem UM Services Inc. properly, (b) failing to adequately substantiate Mr. Huerth's need for skilled nursing facility services (i.e., the extent of his wound care treatment), and/or (c) failing to adequately prepare and/or substantiate the first and/or second level appeals from Anthem's coverage denials, (3) there is a causal connection between MHC's breach of its duty and

Anthem's denial of insurance coverage for Mr. Huerth, and (4) Mr. Huerth suffered

damages as a result of this breach (damages described in ¶ 64, below).

64. MHC's negligence caused Plaintiff Mr. Huerth to incur over $200,700 in damages—

which is the amount that MHC has billed Mr. Huerth for skilled nursing facility

services from January 1, 2013 to the date of MHC's Complaint on November 4,

2014—plus additional accruals of damages for denied claims for skilled nursing care

from November 4, 2014 to the present ($270,765 plus additional accruals according

to Plaintiff's Motion for Summary Judgment dated July 7, 2015 in the matter <u>MHC v.</u>

<u>Richard Huerth</u>, Norfolk Superior Civil No. 14-1490—herafter "<u>MHC v. Huerth</u>").

### COUNT IV: BREACH OF CONTRACT

65. Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1 through

64, inclusive, as set forth herein.

66. The essential elements of a breach of contract action are that "(1) an agreement was

made between the plaintiffs and the defendant supported by valid consideration (2)

the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach

has prevented them from performing; and (4) the plaintiffs have suffered damage."

<u>Singarella v. Boston</u>, 342 Mass. 385 (1961) (citations omitted).

67. MHC was contractually authorized and obligated to properly apply for the health

insurance benefits available to Mr. Huerth to cover the care for which MHC is now

suing Mr. Huerth for payment.  <u>See</u> <u>Exhibit 55</u> at 17-27: MHC's "Admission and

Financial Agreement" (Oct. 26, 2007); <u>Exhibit 1</u>: MHC's "Admission and Financial

Agreement" (July 2, 2008). MHC failed to fully and properly apply for those health

insurance benefits, and is responsible for any care that is not covered by Mr. Huerth's

health insurance as a result. Thus, all the elements for a breach of contract action will have been satisfied because (1) an agreement was made between MHC and Mr. Huerth supported by valid consideration (2) Mr. Huerth has been ready, willing, and able to perform by allowing MHC to pursue Anthem for reimbursement of claims; (3) MHC's breach has prevented Mr. Huerth from performing under the contract (by requiring him to pursue claims against Anthem after Anthem has already denied MHC's negligently-prepared claims and appeals); and (4) Mr. Huerth has suffered damage as a result of the breach (arising from Anthem's non-payment of claims since January 1, 2013).

68. MHC's breach of contract caused Plaintiff Mr. Huerth to incur over $200,700 in damages—which is the amount that MHC has billed Mr. Huerth for skilled nursing facility services from January 1, 2013 to the date of MHC's Complaint on November 4, 2014—plus additional accruals of damages for denied claims for skilled nursing care from November 4, 2014 to the present ($270,765 plus additional accruals according to Plaintiff's Motion for Summary Judgment dated July 7, 2015—see MHC v. Huerth).

## COUNT V: PROMISSORY ESTOPPEL/EQUITABLE ESTOPPEL/REASONABLE RELIANCE

69. Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1 through 68, inclusive, as set forth herein.

70. MHC is liable to Plaintiff Richard Huerth under the theory of equitable estoppel, promissory estoppel and/or reasonable reliance because MHC (including but not limited to MHC's agent, employee, or servant Dr. Brian Kenny) (1) made a promise to Mr. Huerth (2) which it should have reasonably expected to induce forbearance of

a definite and substantial character by Mr. Huerth, (3) Mr. Huerth reasonably relied on the promise to his detriment, and (4) that injustice can be avoided only by enforcement of the promise. See McQueen v. True Partners Consulting, LLC, 28 Mass. L. Rep. 411 at *18-19 (Mass. Sup. Ct., Norfolk Cty. 2011) (citing Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760-61 (1978)).

71. Plaintiff's reasonable reliance on MHC's promise described above resulted in over $200,700 in damages—which is the amount that MHC has billed Mr. Huerth for skilled nursing facility services from January 1, 2013 to the date of MHC's Complaint on November 4, 2014—plus additional accruals of damages for denied claims for skilled nursing care from November 4, 2014 to the present ($270,765 plus additional accruals according to Plaintiff's Motion for Summary Judgment dated July 7, 2015).

### COUNT VI: ABUSE OF PROCESS

72. Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1 through 71, inclusive, as set forth herein.

73. MHC is liable to Plaintiff Richard Huerth for the tort of abuse of process because MHC (a) used the legal process (b) for an ulterior or illegitimate purpose, (c) resulting in damage. See Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010). MHC abused the legal process by initiating both the conservatorship and transfer/discharge proceedings against Mr. Huerth for "ulterior purpose[s] for which [the legal process] was not designed or intended." Id., quoting Quaranto v. Silverman, 345 Mass. 423, 426 (1963).

74. MHC abused the conservatorship process—which is designed to assign to a fiduciary (the conservator) the authority of "managing, expending, and distributing the assets of

the protected person's estate" under the supervision of the Probate and Family Court (MGL c. 190B, sec. 5-416) when that protected person is "unable to manage business property and business affairs effectively because of a clinically diagnosed impairment in the ability to receive and evaluation information or make and communicate decisions" and "the person has property that will be wasted or dissipated unless management is provided or money is needed for the support, care, and welfare of the person or those entitled to the person's support and that protection is necessary or desirable to obtain or provide money" (MGL c. 190B, sec. 5-401(c))—for the ulterior motive of bypassing a judicial determination of Mr. Huerth's liability and seizing amounts alleged to be due.

75. MHC abused the Notice of Intent to Transfer/Discharge Resident Process—which is designed to protect the nursing home's right to transfer or discharge a resident when that resident has "failed, after reasonable and appropriate notice to pay for . . . a stay at the nursing facility" (130 CMR 456.701(A)(5))—without "discuss[ing] the planned discharge from the facility with the resident and his/her legal representative or next of kin" and without "consult[ing] the resident and his/her family or legal representative in choosing another facility" as required by 940 CMR 4.09(6) and (7) for the ulterior motive of rendering Mr. Huerth unavailable (after the transfer to a nursing home in Michigan) to provide live testimony and otherwise defend himself before this Court.

76. Plaintiff alleges damages for abuse of process of at least $12,981.06, which is approximately equivalent to (1) the legal fees paid to Attorney Dmitry Lev and Attorney Les Hoiberg to defend against the Conservatorship proceedings (at least

$2,981.06) and (2) the legal fees paid or to be paid to Attorney Matthew Morris to defend against the Notice of Intent to Transfer/Discharge Resident (at least $10,000).

## VI.   PLAINTIFF RICHARD HUERTH'S CLAIMS AGAINST ANTHEM INSURANCE COMPANIES, INC., ANTHEM UM SERVICES, INC., AND THE VERIZON MEDICAL EXPENSE PLAN FOR NEW YORK AND NEW ENGLAND ASSOCIATES

### COUNT I:  CLAIM FOR BENEFITS UNDER ERISA § 502(A)(1)(B)

77. Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1 through 76, inclusive, as set forth herein.

78. The present dispute between Plaintiff Milton Health Care LLC and Defendant Richard Huerth (see MHC v. Huerth) arises, in part, from the refusal of the Verizon Plan, Anthem Insurance Companies Inc. and Anthem UM Services Inc. (the "Verizon and Anthem Defendants") to cover Mr. Huerth's nursing care expenses at MHC's facility. Mr. Huerth was entitled to health insurance coverage of the care provided by MHC and for which MHC seeks payment under the Verizon Plan as a former employee and retiree of Verizon.

79. Mr. Huerth's care was fully covered and continually paid for under the Verizon Plan when the health insurer under the Verizon Plan was Empire BlueCross BlueShield (which covered Mr. Huerth's skilled nursing care expenses at MHC's facility in full—see Statement of Relevant Facts ("SRF") ¶ 14, supra).

80. Neither the terms of Mr. Huerth's health insurance under the Verizon Plan nor his condition or need for care changed between the time that Mr. Huerth's care at MHC was covered in full by Empire BlueCross BlueShield and the time that Anthem Insurance Companies—as the successor health insurer under the Verizon Plan to Empire BlueCross BlueShield—began denying coverage for Mr. Huerth's care at

27

MHC based on the assertion that Anthem CG-MED-31: Skilled Nursing Facility Services was not satisfied.

81. The Verizon and Anthem Defendants have consistently denied all of Mr. Huerth's claims for coverage for his care at MHC that are the basis for MHC's instant lawsuit against Mr. Huerth. Any further appeals by Mr. Huerth or anyone on his behalf of the denials of coverage of his treatment would have been futile, as the Verizon and Anthem Defendants had already consistently denied coverage for the care in question and would continue to do so with regard to any further submissions.  The Verizon and Anthem Defendants therefore cannot deny liability under this count based on any failure to exhaust administrative remedies or rights of appeal.

82. The only grounds asserted by Verizon and Anthem Defendants for denying coverage of Mr. Huerth's care at MHC is that the care was not medically necessary because it did not satisfy the terms of Anthem CG-MED-31: Skilled Nursing Facility Services. Mr. Huerth's care at issue, however, satisfied the terms of Anthem CG-MED-31: Skilled Nursing Facility Services.

83.  Anthem CG-MED-31 provides that skilled nursing facility services, such as those provided by MHC to Mr. Huerth, qualify as "medically necessary" if all of the criteria in Section A and at least one of the criteria in Section B set forth in the guideline are met.

84.  The facts set forth in SRF ¶¶ 22 to 30 above demonstrate that all conditions and terms of Section A of Anthem CG-MED-31 are satisfied.

85. The facts set forth in SRF ¶¶ 28 and 33-36 above demonstrate that conditions 3 and 6 of Section B of Anthem CG-MED-31 are satisfied in Mr. Huerth's case.

86. Because the conditions of Anthem CG-MED-31 are satisfied, Mr. Huerth's care at MHC is medically necessary and should have always been paid for, but was not, by the Verizon and Anthem Defendants

87. The Verizon and Anthem Defendants improperly denied coverage for Mr. Huerth's skilled nursing care in violation of ERISA, 29 U.S.C. § 1001 et seq.

88. Pursuant to ERISA § 1132, (also known as 502(a)(1)(B)), a participant or a beneficiary may bring a civil action "to recover benefits due to him under the terms of his Plan, to enforce his rights under the terms of the Plan, or to clarify his rights to future benefits under the terms of the Plan." 29 USC § 1132(a)(1)(B). This civil action may either be brought in federal court or a "[s]tate court[] of competent jurisdiction." Id. § 1132(e)(1). The Massachusetts Superior Court is a state court of competent jurisdiction as defined by ERISA § 1132(e)(1).

89. Plaintiff is entitled to bring a civil action against the Verizon and Anthem Defendants under this section.

90. The Verizon and Anthem Defendants were obligated—under the terms of the Verizon Plan and the terms of the health insurance at issue (including but not limited to Anthem CG-MED-31)—to pay for the medical, nursing, residential and other care provided by MHC to Mr. Huerth, including the care for which MHC seeks payment in the present lawsuit brought by it against Mr. Huerth.

91. The Verizon and Anthem Defendants have failed to make these payments.

92. Pursuant to 502(a)(1)(B), this Court should enforce Mr. Huerth's rights to the applicable payments, order that all unpaid claims to date be paid, and order that Mr. Huerth is entitled to future payment of his care.

93. Mr. Huerth is entitled to recover the benefits due him and this Court should order payment of the benefits by the Verizon and/or Anthem Defendants.

94. This Court should, therefore, order that all unpaid medical care to date be paid by the Verizon and/or Anthem Defendants and that they pay for all such care from this date forward as well.

95. The Verizon and Anthem Defendants are liable to Mr. Huerth under this Count I for damages at least equivalent to any amount of damages alleged by Plaintiff MHC for any skilled nursing care services that MHC rendered to Mr. Huerth from January 1, 2013 to the present (at least (a) $200,700 as alleged in Plaintiff's Complaint and (b) $270,765 as alleged in Plaintiff's Motion for Summary Judgment—see MHC v. Huerth), and by incurring the costs of the instant action as a result of the breach.

### COUNT II:  CLAIM FOR ATTORNEYS' FEES UNDER ERISA § 502(G)

96. Plaintiff incorporates and restates as though fully set forth herein all of the facts and allegations set forth in paragraphs 1 through 95 above.

97. Pursuant to Section 502(G) of ERISA, the Plaintiff is entitled to an award of attorneys' fees and costs. This Court should award attorneys' fees and costs to the Plaintiff.

### COUNT III: PROMISSORY ESTOPPEL, EQUITABLE ESTOPPEL, AND/OR REASONABLE RELIANCE UNDER MASSACHUSETTS LAW

98. Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1 through 97, inclusive, as set forth herein.

99. The Verizon Plan is liable to Mr. Huerth for promissory estoppel, equitable estoppel, and/or reasonable reliance because (1) the Verizon Plan made an implied promise to Mr. Huerth that (a) his long-term skilled nursing home services would be covered by

Anthem BlueCross BlueShield because Empire BlueCross BlueShield covered these

exact services and/or (b) there would be no significant disruption in the coverage for

Mr. Huerth's long term skilled nursing expenses when Anthem BlueCross BlueShield

became the successor health insurer to Empire BlueCross BlueShield on January 1,

2013, (2) the Verizon Plan should have reasonably expected this implied promise to

induce forbearance of a definite and substantial character by Mr. Huerth (e.g., seeking

another health insurance company or seeking an alternative living arrangement),

(3) Mr. Huerth reasonably relied on the implied promise to his detriment, and (4)

injustice can be avoided only by enforcement of the promise. See McQueen v. True

Partners Consulting, LLC, 28 Mass. L. Rep. 411 at *18-19 (Mass. Sup. Ct., Norfolk

Cty. 2011) (citing Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757,

760-61 (1978)).

100.    The Verizon Plan is liable to Mr. Huerth under this Count III for damages at least

equivalent to any amount of damages alleged by MHC for any skilled nursing care

services that MHC rendered to Mr. Huerth from January 1, 2013 to the present (at

least (a) $200,700 as alleged in Plaintiff's Complaint and (b) $270,765 as alleged in

Plaintiff's Motion for Summary Judgment—see MHC v. Huerth), and by incurring

the costs of the instant action as a result of the breach.

### COUNT IV: BREACH OF CONTRACT UNDER MASSACHUSETTS LAW

101.    Plaintiff Richard Huerth repeats each and every allegation in paragraphs 1

through 100, inclusive, as set forth herein.

102.    The essential elements of a breach of contract action are that "(1) an agreement

was made between the plaintiffs and the defendant supported by valid consideration

31

(2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's

breach has prevented them from performing; and (4) the plaintiffs have suffered

damage." <u>Singarella v. Boston</u>, 342 Mass. 385 (1961) (citations omitted).

103.    The Verizon and Anthem Defendants were contractually obligated to cover the

medical care provided by MHC, but have breached that obligation by failing to pay

for the medical care provided by MHC.

104.    The Verizon Plan, and the terms of the health insurance provided by Anthem

Insurance Companies, Inc. (working in conjunction with Anthem UM Services, Inc.),

constitute a contract between the Verizon and Anthem Defendants and Mr. Huerth.

105.    All of the medical care provided by MHC and for which MHC seeks payment in

this lawsuit are required to be paid for by the Verizon and/or Anthem Defendants

under the terms of that contract.

106.    The Verizon and Anthem Defendants have failed and refused to pay for that

medical care, thus breaching the contract. Thus, the essential elements for an action of

breach of contract have been met because (1) an agreement was made between Mr.

Huerth and the Verizon and Anthem Defendants supported by valid consideration (2)

Mr. Huerth has done everything expected of him under the terms of that contract

(<u>e.g.</u>, paying his premiums and co-pays); (3) the Verizon and Anthem Defendants'

breach has prevented Mr. Huerth from performing (making it impossible for Mr.

Huerth to pay for the "uncovered" skilled nursing care); and (4) Mr. Huerth has

suffered damage as a result of the Verizon and Anthem Defendants' breach.

107.    Plaintiff has been injured by this breach in the amount claimed, or which may be

recovered from him, by MHC (at least (a) $200,700 as alleged in Plaintiff's

Complaint and (b) $270,765 as alleged in Plaintiff's Motion for Summary

Judgment—see <u>MHC v. Huerth</u>), and by incurring the costs of the instant action as a

result of the breach.


WHEREFORE, for each Count asserted herein, Plaintiff prays this Court to:

A.   find for Plaintiff in the amount owed;

B.  award Plaintiff reasonable attorneys' fees, plus statutory interest pursuant to G.L. c. 231 §

6C and costs of suit; and

C.  award such further relief as the Court deems just and proper.

THE PLAINTIFF DEMANDS TRIAL BY JURY ON ALL MATTERS SO TRIABLE.


RESPECTFULLY SUBMITTED BY
RICHARD HUERTH

By his Attorneys,


Dated: September 14, 2015

Matthew A. Morris, Esq., BBO #676560
Kerstein, Coren & Lichtenstein, LLP
60 Walnut Street, 4th Floor
Wellesley, MA 02481
Tel: (781) 997-1635
Fax: (781) 997-1633
Email: mmorris@kcl-law.com

by Matthew Morris

Stephen D. Rosenberg, Esq. BBO # 558415
The Wagner Law Group, P.C.
99 Summer Street, 13th Floor
Boston, MA 02110
Tel:  (617) 357-5200
Fax:  (617) 357-5020
Email: srosenberg@wagnerlawgroup.com

## VERIFICATION

I, RICHARD HUERTH, of 1200 Brush Hill Road in Milton, Massachusetts, state that I have read the allegations set forth in the Verified Complaint, Ex Parte Motion for Short Order of Notice, Emergency Petition for Preliminary Injunctions, and Memorandum in Support of Emergency Petition for Preliminary Injunctions, and that they are true to the best of my knowledge, information, and belief.


Date: September _11_, 2015

Richard Huerth