UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13568-RWZ

RICHARD J. HUERTH

v.

ANTHEM INSURANCE COMPANIES INC., *et al.*

MEMORANDUM OF DECISION

June 26, 2017

ZOBEL, S.D.J.

Plaintiff Richard J. Huerth resided at and received care at Milton Health Care, LLC ("MHC"), a skilled nursing facility ("SNF") in Milton, Massachusetts, from 2007 to 2016. Beginning in 2013, when Huerth's health insurance plan switched claim administrators to Anthem Blue Cross Blue Shield, 43 claims for services he received at MHC were denied.

In this action, Huerth brings a claim for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA") against the following "Plan Defendants": Anthem Insurance Companies, Inc., Anthem UM Services, Inc. (together, "Anthem"), and his employer-sponsored health care plan, the Verizon Medical Expense Plan for New York and New England Associates (the "Verizon plan"). He also brings six state law claims against MHC. MHC moves for judgment as a case stated against Huerth. See Docket

# 69. Huerth moves for judgment as a case stated against all defendants. See Docket # 74. The Plan Defendants move for summary judgment on the administrative record. See Docket # 77.

I.   **Background**

The facts underlying this case are set forth in this court's February 3, 2016, Memorandum and Order on the Plan Defendants' motion to dismiss. See Memorandum and Order, Huerth v. Anthem Ins. Cos., No. 15-cv-13568-RWZ (D. Mass. Feb. 3, 2016), ECF No. 47. I repeat only those facts necessary to frame the issues here.

In 1974, Huerth suffered an injury during an accident that left him paralyzed from the waist down. At the time, he was working for New England Telephone (now Verizon), where he continued to work until 1997, at which point he accepted early retirement. His early retirement package included lifetime health insurance under an ERISA-covered and Verizon-sponsored plan. After his retirement, Huerth lived on his own until 2005, when he moved into a SNF in Norwood, Massachusetts. On October 22, 2007, Huerth moved from that SNF to MHC.

From October 22, 2007, until December 31, 2012, Huerth's medical expenses from his care at MHC were paid in full by Empire Blue Cross Blue Shield ("Empire"), which was then the claims administrator of the Verizon plan. However, on January 1, 2013, Verizon switched claims administrators from Empire to Anthem Blue Cross Blue Shield, the trade name of Anthem Insurance Companies, Inc. Anthem UM Services, Inc., provided "utilization management" ("UM") review services — processes to help

determine which services are medically necessary under a plan — for Anthem Insurance Companies, Inc.

Between August 2013 and July 2015, Anthem denied 43 claims for services billed by MHC. As relevant here, MHC filed first and second level appeals for claims related to benefits provided in February, March, and May 2013. These appeals were all ultimately denied.

On November 4, 2014, MHC filed an action against Huerth in Norfolk County Superior Court, seeking payment for services rendered for which Anthem denied coverage. Huerth filed a complaint against MHC and the Plan Defendants in Norfolk Superior Court on September 14, 2015. The Plan Defendants removed this action on October 14, 2015, and filed a Motion to Dismiss on October 23, 2015. See Docket ## 1, 14. On February 3, 2016, this court allowed in part and denied in part the Plan Defendants' motion, allowing only Huerth's claim for benefits under ERISA to go forward. See Docket # 47.

## II.  Claim Against the Plan Defendants

Huerth's remaining claim against the Plan defendants is for benefits under ERISA § 502(a)(1)(B). See 29 U.S.C. § 1132(a)(1)(B).

### A.  Standard of Review

In his initial Memorandum in Support of Motion for Judgment as a Case Stated, Huerth states that "the parties expressed their intent to have this District Court resolve . . . his one remaining claim against the Plan Defendants on a case-stated basis." Docket # 75, at 9. The Plan Defendants, however, explicitly maintain that they "did not agree to resolve Plaintiff's remaining ERISA claim against them on a case-stated basis"

and instead urge the court to decide the case as a motion for summary judgment on the administrative record. Docket # 84, at 4. In response, Huerth asserts that "[i]t was the understanding of counsel for Mr. Huerth that all parties agreed to proceed with resolving this matter by means of motions for judgment as a case stated." Docket # 89, at 4 n.3. Nevertheless, he states that practically, "the difference between the two procedural vehicles is negligible," id. at 4, and that "[g]iven the nature of summary judgment proceedings in an ERISA action, the case stated model ends up with the same result for all intents and purposes with regard to Mr. Huerth's claims against the Plan Defendants," id. at 4 n.4. Given the parties' largely compatible positions, I resolve this case as cross-motions for summary judgment.

"[I]n an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. . . . This means the non-moving party is not entitled to the usual inferences in its favor." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005) (citations omitted); see also Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 82–83 (1st Cir. 2010).[1] The level of deference given to the administrator depends on the terms of the plan. See Gent, 611 F.3d at 83. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When a plan

---

[1] Both Huerth and the Plan defendants agree that if the summary judgment standard is used, then this is the applicable standard. See Docket # 84, at 4; Docket # 89, at 4.

4

gives the administrator discretion, then the administrator's decision is reviewed for abuse of discretion. McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015).

Here, Huerth and the Plan Defendants agree that "the express terms of the Plan give discretionary authority to the Plan Defendants." Docket # 83, at 11; see also Docket # 78, at 18. Accordingly, their decision is reviewed for abuse of discretion. McDonough, 783 F.3d at 379. "A court that undertakes abuse of discretion review in an ERISA case must determine whether the claims administrator's decision is arbitrary and capricious or, looked at from another angle, whether that decision is reasonable and supported by substantial evidence on the record as a whole." Id.

### B. Discussion

Huerth maintains that the care he received was "medically necessary" under the Anthem UM Guideline, and he was therefore wrongfully denied coverage. The Plan Defendants argue that for the exhausted claims, Anthem's determinations were reasonable and supported by substantial evidence, that Huerth did not exhaust his administrative remedies for the remaining claims, and that even if the futility exception applied to the unexhausted claims, the denial of these claims was not arbitrary and capricious.

#### 1. Anthem's Clinical UM Guideline

Under the Anthem Clinical UM Guideline applicable during the time Huerth's claims arose (CG-MED-31H), "[s]killed nursing facility (SNF) services are **medically necessary** when **ALL** of the following criteria in Section A are met **and** one or more of

the criteria in Section B are met:" AR[2] ANTHEM-0000397.

**Section A:**

    1.    The individual requires skilled nursing or skilled rehabilitation services that must be performed by, or under the supervision of, professional or technical personnel; **and**

    2.    The individual requires these skilled services on a **daily** basis; (note: if skilled rehabilitation services are not available on a 7-day-a-week basis, an individual whose inpatient stay is based solely on the need for skilled rehabilitation services would meet the "daily basis" requirement when he/she needs and receives those services at least 5 days a week); **and**

    3.    As a practical matter, the daily skilled services can be provided only on an inpatient basis in a skilled nursing facility (SNF) setting; **and**

    4.    SNF services must be furnished pursuant to a physician's orders and be reasonable and necessary for the treatment of an individual's illness or injury (i.e., be consistent with the nature and severity of the individual's illness or injury, his particular medical needs and accepted standards of medical practice[)]; **and**

    5.    Initial admission and subsequent stay in a SNF for skilled nursing services or rehabilitation services must include development, management and evaluation of a plan of care as follows:

        a.    The involvement of skilled nursing personnel is required to meet the individual's medical needs, promote recovery and ensure medical safety (in terms of the individual's physical or mental condition); **and**

        b.    There must be a significant probability that complications would arise without skilled supervision of the treatment plan by a licensed nurse; **and**

        c.    Care plans must include realistic nursing goals and objectives for the individual, discharge plans and the planned interventions by the nursing staff to meet those goals and objectives; **and**

        d.    Updated care plans must document the outcome of the planned interventions; **and**

        e.    There must be daily documentation of the

---

[2]     "AR" refers to the Administrative Record filed with this court. See Docket # 61.

individual's progress or complications.

**Section B:**[3]

3. **Complex medication regimen**
   a. The individual must have a complex range of new medications (including oral medications) following a hospitalization where there is a high probability of adverse reactions or a need for changes in the dosage or type of medication.
   b. Documentation required to authorize initial admission and extensions must include the individual's unstable condition, medication changes and continuing probability of complications.
   **OR**

. . .

6. **Wound care (including decubitus/pressure ulcers)**
   **NOTE:** Skilled nursing facility placement solely for the purpose of wound care should be rare.
   **All** of the following criteria must be met:
   a. Wound care must be ordered by a physician; **and**
   b. The individual must require **extensive** wound care (e.g.,, packing, debridement or irrigation of multiple stage II, or one or more stage III or IV wounds); **and**
   c. Skilled observation and assessment of a wound must be documented daily and should reflect any changes in wound status to support the medical necessity for continued observation.

Id. at 0000397–98. The Clinical Guideline also provides the following under the

heading "Not Medically Necessary":

A skilled nursing facility (SNF) setting is considered **not medically necessary** when **any one** of the following is present:

1. Services do not meet the medically necessary criteria above;
   **or**
2. The individual's condition has changed such that skilled

---

[3] Only the subsections relevant to this case are included.

7

> medical or rehabilitative care is no longer needed; **or**
> 3. Physical medicine therapy or rehabilitation services in which there is not a practical improvement in the level of functioning within a reasonable period of time; **or**
> 4. Services that are solely performed to preserve the present level of function or prevent regression of functions for an illness, injury or condition that is resolved or stable; **or**
> 5. The individual refuses to participate in the recommended treatment plan; **or**
> 6. Care is initially or has become custodial; **or**
> 7. The services are provided by a family member or another non-medical person. When a service can be safely and effectively self-administered or performed by the average non-medical person without the direct supervision of a nurse, the service cannot be regarded as a skilled service.

Id. at 0000399. After this section, the Guideline provides "examples of services that do not require the skills of a licensed nurse or rehabilitation personnel and are therefore considered to be **not medically necessary** in the skilled nursing facility setting **unless** there is documentation of comorbidities and complications that require individual consideration." Id.

In denying Huerth's February and March 2013 claims, Anthem UM Services wrote:

> We cannot approve your request for continued stay in a Skilled Nursing Facility. This is considered not medically necessary. Information given to us shows that you are not making progress with your physical therapy. Other care that you are getting can be done by people who do not have medical training. This is not skilled care. Your care is considered custodial. We based this decision on the health plan clinical guideline titled: Skilled Nursing Facility Services (CG-MED-31).

AR ANTHEM 0001725. Subsequent letters from Anthem UM Services similarly cited the Skilled Nursing Facility Services Clinical Guideline and included that Huerth's care "is not skilled care," "is custodial in nature," or is "not medically necessary." See, e.g., AR ANTHEM 0001512, 0001725, 0001729, 0001732–33 0001748, 0001752–53,

0002215.

Huerth asserts that, inter alia, the following assessments from MHC demonstrate that he requires skilled nursing care: (1) An August 15, 2013, letter stating that "he is a physical assist with bathing, and limited assist with grooming . . . . He requires Skilled Nursing care for wound care, pain management, colostomy care, subrapubic [catheter], and contractures." AR ANTHEM 0003888; (2) A November 14, 2013, letter including that "Huerth's nursing notes clearly indicate daily dressing changes to the unstageable wound in February, 2013 and May, 2013. Daily skilled nursing care by a professional nurse was most certainly warranted to make observations of the wound for signs and symptoms of drainage and infection. This skilled observation could not have been performed by a lay person in another setting." AR ANTHEM-004139; (3) A sworn statement from a nurse practitioner, submitted to Norfolk County Probate and Family Court in support of a petition for appointment of a conservator or other protective order that stated "Huerth was admitted to Milton Health Care on 10/22/2007 with diagnoses of spinal cord injury, paraplegia . . . stage IV [wound] on buttocks, anemia, depression," and that his "condition has not improved significantly since admission in 2007." Plaintiff Exhibit 22; (4) 2015 orders from Huerth's physician which included that Huerth needed to be assessed "for pain every shift," checked "for bleeding & bruising every shift," and that Huerth's wounds should be "measure[d] and stage[d] . . . and document[ed] in wound book every week." Plaintiff Exhibit 22; and (5) A letter from Huerth's treating physician stating that Huerth has wounds being treated twice a day and that he

"requires regular injury monitoring as well as lab work." Docket # 89-1.[4] Accordingly, Huerth claims, in addition to meeting the criteria of Section A, he qualifies for SNF care under conditions 3 ("Complex medication regimen") and 6 ("Wound care") of Section B.

The Plan Defendants, on the other hand, contend that the record shows that Huerth did not meet certain necessary criteria to qualify for SNF services. They claim that the "the medical records show that Milton's services did not include 'a plan of care' consisting of 'discharge plans,' let alone 'realistic nursing goals and objectives for Plaintiff,'" and so Huerth does not meet all of the criteria for Section A. Docket # 78, at 20. Further, the Plan Defendants argue that Huerth did not meet all of the necessary criteria for either condition 3 or 6 in Section B. The Plan Defendants also maintain that the "care concerning Plaintiff's suprapubic catheter and self-managing colostomy . . . are plainly custodial under the terms of Anthem's clinical guidelines." Id. at 21.

To be sure, Huerth makes a strong argument that he meets at least most of the criteria for medically necessary SNF services under Sections A and B of the Clinical Guideline. The record reveals that Huerth required and received extensive care on a daily basis. See, e.g., AR ANTHEM-0001342–58; AR ANTHEM-0001364–1441; AR ANTHEM-0004139–40. This care included, inter alia, suprapubic catheter care, wound measurement and staging, and as of April 2013, "irrigat[ing] the buttock wound with normal saline, apply[ing] polysporin powder, pack[ing] with calcium alginate and cover[ing] with foam pro-vail 6x6 daily." Id. at 0004140; see also id. at 0001346. To someone unversed in Anthem's Clinical UM Guideline, such care may sound like an

---

[4] Huerth maintains that "[t]his letter either is, or should be, contained in the administrative record." Docket # 89, at 9 n.7.

appropriate candidate for SNF services.

However, the issue here is whether the Plan Defendants' decision is "arbitrary and capricious or, looked at from another angle, whether th[e] decision is reasonable and supported by substantial evidence on the record as a whole." McDonough, 783 F.3d at 379. Given the strict and manifold criteria in the Clinical UM Guideline, I cannot say the Plan Defendants abused their discretion. For example, Section A includes that "[c]are plans must include realistic nursing goals and objectives for the individual, discharge plans and the planned interventions by the nursing staff to meet those goals and objectives." AR ANTHEM-0000398. Section B(6), "Wound Care," requires that "[s]killed observation and assessment of a wound . . . be documented daily and should reflect any changes in wound status to support the medical necessity for continued observation." Id. at 0000379. And under the "Not Medically Necessary" heading, the Guideline provides that a SNF setting is not medically necessary when "[s]ervices . . . are solely performed to preserve the present level of function or prevent regression of functions for an illness, injury or condition that is resolved or stable." Id. at 0000399. The Plan Defendants could have reasonably determined that under the Clinical UM Guideline, Huerth's services did not qualify for a SNF setting.

Indeed, the Anthem Guideline is structured such that someone requiring long-term care who seeks to qualify for a SNF faces a high hurdle. By its own terms, the plan describes a SNF as "an institution . . . that mainly provides inpatient skilled nursing and related services to individuals requiring <u>convalescent and rehabilitative care</u>." Id. at 0000397 (emphasis added). Apparently in accordance with this definition, the Guideline includes several, specific criteria to qualify for SNF services, and the Plan

11

administrators have discretion to "[i]nterpret the Plans based on their provisions and applicable law and make factual determinations," id. at 0000122. Whether the Plan Defendants' decision was the best interpretation of this stringent Clinical Guideline, it was not arbitrary and capricious.

### 2. Conflict of Interest

Huerth claims that "the Plan Defendants suffered from a structural conflict of interest when they denied coverage," which undermines the reasonableness of their decisions. Docket # 75, at 25. He initially argues that such a conflict arose because "[t]he Anthem entities were delegated the discretion to decide . . . claims while at the same time having to pay such claims if they were covered." Id. Then, in his reply to the Plan Defendants' opposition, Huerth points to the Verizon Summary Plan Description ("SPD"), which states that the Plan Administrator is the Chairperson of the Verizon Employee Benefits Committee, and the Plan Sponsor is Verizon Communications, Inc. See AR ANTHEM-0000149. He then explains that Verizon is the entity that both pays the benefits covered under the plan and ultimately resolves disputes over claims. Specifically the SPD provides under the heading "Plan Funding," that "[e]xcept for certain HMO benefits, an insurance company does not finance the Medical Plan and the Alternate Choice Plan, nor are Plan benefits guaranteed under a contract of insurance." Id. at 0000152. Rather, Verizon "has the discretion to pay claims out of the general assets of the Company, and certain benefits are currently funded through a trust." Id. The SPD also states that "[i]f the Verizon Benefits Center is unable to resolve the disagreement, Verizon has formal appeal procedures in place for Employee Retirement Income Security Act of 1974 (ERISA) covered plans." Id. at 0000123. For

12

benefits claims, the "Verizon Claims Review Committee (VCRC) . . . has delegated its authority to finally determine claims to the claims administrators for Benefit claims." Id. at 0000128. Huerth contends, "[t]his structural conflict is so obvious as to need no further elaboration; if there is any dispute over coverage for a particular claim, the decision reverts back to Verizon itself, the same entity that pays the benefits in question." Docket # 89, at 7.

"[A] conflict [of interest] exists whenever a plan administrator, whether an employer or an insurer, is in the position of both adjudicating claims and paying awarded benefits." Denmark v. Liberty Life Assurance Co. of Bos., 566 F.3d 1, 7 (1st Cir. 2009) (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111–15 (2008)). When a conflict of interest exists, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone Tire & Rubber Co., 489 U.S. at 115 (alteration in original) (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)). A structural conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Glenn, 554 U.S. at 117.

Here, Huerth initially suggests that the structural conflict is within the Anthem entities but then says it is within Verizon. In his opposition to the Plan Defendants' motion for summary judgment, Huerth claims that "[t]he Plan Defendants are simply

one and the same, and the fiction of different corporate entities changes nothing in substance." Docket # 83, at 20. Based on his arguments and the SPD itself, it is unclear whether a structural conflict does indeed exist, and if so, within which entity (or entities). However, even assuming a structural conflict existed, it would not change the outcome here. Both sides agree that Verizon sponsors the plan, and that, at least in this case, Anthem made the benefits determination. See Docket # 84, at 6–7; Docket # 89, at 6–7. Huerth's argument is that because "the Verizon Plan Administrator has delegated (but not abdicated) its authority to render benefits determinations, like those rendered in Mr. Huerth's case, to entities such as Anthem Blue Cross Blue Shield," no actual "firewall between the Verizon Plan Administrator and the Anthem entities" exists. Docket # 89, at 6–7. Whatever the merits of this argument in the theoretical sense, under the circumstances of this case, any such conflict would not affect the conclusion that no abuse of discretion occurred. See Glenn, 554 U.S. at 117.

### 3. The Plan Defendants' Reasoning

Finally, Huerth contends that the "Plan Defendants' denial of coverage in the instant matter was haphazard and insufficient under the law of this Circuit, rendering their decision an abuse of discretion." Docket # 75, at 25. He claims that "the Plan Defendants simply issued pro forma denials of his claims for benefits," which does not constitute "a reasoned denial." Docket # 83, at 13.

Under ERISA, "every employee benefit plan shall . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). "Though the

14

claims administrator must give particular reasons for the denial of benefits, . . . it need not spell out 'the interpretive process that generated the reason for the denial.'" Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 813 F.3d 420, 426 (1st Cir. 2016) (citations omitted) (quoting Gallo v. Amoco Corp., 102 F.3d 918, 922 (7th Cir. 1996)).  Accordingly, "[t]he denial letter need not detail every bit of information in the record; it must have enough information to render the decision to deny benefits susceptible to judicial review."  Orndorf, 404 F.3d at 526.  Further, "an ERISA benefits determination must be a reasoned determination, and '[a] benefits determination cannot be "reasoned" when the [claims] administrator sidesteps the central inquiry.'" McDonough, 783 F.3d at 380 (alterations in original) (quoting Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 67 (1st Cir. 2013)).

Here, Anthem's denial letters contained the reasons for denying Huerth's benefits.  For example, in the letter denying Huerth's claims for February and March 2013, Anthem UM wrote:

> We cannot approve your request for continued stay in a Skilled Nursing Facility.  This is considered not medically necessary.  Information given to us shows that you are not making progress with your physical therapy. Other care that you are getting can be done by people who do not have medical training.  This is not skilled care.  Your care is considered custodial.  We based this decision on the health plan clinical guideline titled: Skilled Nursing Facility Services (CG-MED-31).

AR ANTHEM-0001725.  When denying the request for care after the first level appeal, Anthem UM explained:

> There is a lack of needs to be performed by a professional nurse or therapist. Per the health plan clinical guidelines: Skilled Nursing Care and Custodial Care, to qualify for treatment in this type of health care facility the

15

> member must require each day multiple assessments of vital signs and
> body systems and other skilled needs (medical care, therapies, etc. from a
> licensed professional). General care and supervision is not considered a
> skilled need.

Id. at 0001732–33. These letters provided sufficient information to permit review. Cf. Stephanie C., 813 F.3d at 426. Nor did the Plan Defendants sidestep the "central inquiry." Rather, they evaluated Huerth's conditions, compared them to the Clinical Guideline, and determined that the conditions did not meet all of the necessary criteria.

### 4. Exhaustion

The Plan Defendants maintain that because Huerth exhausted his administrative remedies only for his February, March, and May 2013 claims, summary judgment should be entered in their favor for the remaining claims for failure to exhaust. Huerth argues that pursuing administrative appeals would have been futile.

"Before a plaintiff asserts an ERISA claim . . . he first must exhaust his administrative remedies." Madera v. Marsh USA, Inc., 426 F.3d 56, 61 (1st Cir. 2005). However, exhaustion is not required "in those instances where it would be futile for [a plaintiff] to do so." Id. at 62. "For [the futility] exception to apply, . . . those in pursuit must show that the administrative route is futile . . . . A blanket assertion, unsupported by any facts, is insufficient to call this exception into play." Drinkwater v. Metro. Life Ins. Co., 846 F.2d 821, 826 (1st Cir. 1988).

To the extent Huerth's conditions are the same as they were during February, March, and May 2013, then exhaustion likely was futile. However, even if his failure to exhaust is excused, the Plan Defendants did not act arbitrarily and capriciously in denying the non-exhausted claims for the reasons above. To the extent there was a

16

change in Huerth's conditions that may have affected his benefits determination, then he should have exhausted these claims. For those denials based on lack of medical necessity, Anthem explained the reasons for its decision, with specific references to Huerth's condition. See, e.g., AR ANTHEM 0002676–77, 0003523, 0003561–62, 0003591–92, 0003621–22, 0003649–50, 0003673–74. Huerth offered no proof that his conditions changed such that his eligibility for SNF would have been affected, or that if any change occurred from his previous claims, that Anthem would not have seriously considered his arguments had he exhausted his administrative remedies. See Madera, 426 F.3d at 63 (explaining, at the summary judgment stage, that "there [was] no proof that it would have been futile for [plaintiff] to exhaust his administrative remedies").[5]

Accordingly, Huerth's Motion for Judgment as a Case Stated (Docket # 74) which as explained above, is being treated as a motion for summary judgment against the Plan Defendants, is DENIED. The Plan Defendants' Motion for Summary Judgment (Docket # 77) is ALLOWED.

### III. Claims Against MHC

Huerth brings six state-law claims against MHC, which at all times relevant to this case was a Massachusetts limited liability company with a principal place of business in Massachusetts. In the Plan Defendants' Notice of Removal, they include that "[t]his Court has supplemental jurisdiction over Plaintiff's state law claims against Milton (Counts I through VI against Milton in the Verified Complaint) pursuant to 28 U.S.C. § 1367 because those claims 'form part of the same case or controversy' as the claims

---

[5] This court held at the motion to dismiss phase that Huerth's complaint adequately pleaded futility. See Docket # 47, at 6. However, at the summary judgment phase, more than pleading is required for failure to exhaust to be excused based on futility. See Madera, 426 F.3d at 63.

17

over which the Court has original jurisdiction." Docket # 1, at ¶ 11. However, "[i]t is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction." McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004).[6]

Under 28 U.S.C. § 1367, district courts have supplemental jurisdiction over "claims that are so related to claims in the action within [this court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). "State and federal claims are part of the same 'case or controversy' for the purposes of section 1367(a) if they '"derive from a common nucleus of operative fact" or "are such that [they] . . . would ordinarily be expected to [be] tr[ied] . . . in one judicial proceeding."'" Allstate Interiors & Exteriors, Inc. v. Stonestreet Const., LLC, 730 F.3d 67, 72 (1st Cir. 2013) (alterations in original) (quoting Penobscot Indian Nation v. Key Bank of Me., 112 F.3d 538, 564 (1st Cir. 1997)). "The jurisdictional question is determined from what appears on the plaintiff's claim, without reference to any other pleadings." Ortiz-Bonilla v. Federación de Ajedrez de P.R., Inc., 734 F.3d 28, 34 (1st Cir. 2013).

Although Huerth's federal claim against the Plan Defendants is certainly related to his state law claims against MHC, I am not persuaded that "they form part of the same case or controversy" for the purposes of supplemental jurisdiction. The claims Huerth brings against MHC are for violation of Massachusetts General Laws chapter

---

[6] On November 12, 2015, Huerth filed a motion to remand to state court on the basis that MHC "did not consent to removal within the statutorily required time period." Docket # 27, at 1; see Docket # 28, at 3. This motion did not raise the issue of lack of subject matter jurisdiction over MHC. The motion was denied on February 4, 2016. See Docket # 49.

93A, conversion, negligence, breach of contract, promissory estoppel/equitable estoppel/reasonable reliance, and abuse of process. Docket # 1-1, at 21–28. The 93A claim is based on the process MHC used when seeking to transfer Huerth to another facility; the conversion claim is based on MHC's gaining control over a number of Huerth's Social Security Disability Insurance checks; the negligence and breach of contract claims are based on how MHC sought benefits for Huerth's care at MHC; the promissory estoppel/equitable/reasonable reliance claim is based on representations made to Huerth in connection with MHC seeking benefits for Huerth's care; and the abuse of process claim is based on MHC's initiation of conservatorship and transfer/discharge proceedings against Huerth. To be sure, at least some of these claims arose because the Plan Defendants denied coverage for Huerth's care at Anthem. Nevertheless, these claims arguably derive from a distinct set of facts from those that form Huerth's federal claim against the Plan Defendants.

Even assuming, however, that I had the power to hear Huerth's claims against MHC, I would decline to do so in this situation. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999) ("[D]istrict courts do not overstep Article III limits when they decline jurisdiction of state-law claims on discretionary grounds without determining whether those claims fall within their pendent jurisdiction."). "[D]istrct courts may decline to exercise supplemental jurisdiction over a claim" under the following circumstances:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or

19

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Here, were I to retain jurisdiction, Huerth's six claims against MHC, which raise various questions of state law, would predominate over his single ERISA claim against the Plan Defendants. This is particularly so given the disposition of his one federal claim. Accordingly, given the nature and number of state law claims here, a remand of Huerth's claims against MHC is the more appropriate course of action. These claims are remanded to Norfolk Superior Court for lack of subject matter jurisdiction.

## IV. Conclusion

Huerth's Motion for Judgment as a Case Stated against the Plan Defendants (Docket # 74) is DENIED. The Plan Defendants' motion for summary judgment (Docket # 77) is ALLOWED. Huerth's claims against MHC are REMANDED to state court.

Judgment will be entered accordingly.

| | |
|---|---|
| June 26, 2017 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
| | SENIOR UNITED STATES DISTRICT JUDGE |